IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, § § § **Plaintiff,** § § v. § **CARL KEITH BATTIE,** § § **Defendant.** § § | Case No. 3:17-cv-1113 _____ |

# COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against Defendant Carl Keith Battie ("Battie"), alleges:

## SUMMARY

1.  From 2011 through 2014, Defendant Battie operated a Ponzi scheme under the guise of a real estate investment program. Battie offered investments in single family and multi-unit residences. He also offered notes secured by these properties. Investors were told that Battie's organization would refurbish, find qualified renters for, and then manage and guarantee rental income. Investors were assured that this would result in safe and reliable returns of up to 35% per year from the rentals. They were also told that they would earn additional profits when the property was sold to the renter or another qualified buyer.

2.  Battie's investment program was a sham. He acquired highly distressed properties in very low income parts of St. Louis and other cities. He did not refurbish the properties, as promised. If they were refurbished at all, he contracted for the bare minimum work necessary to obtain a certificate of occupancy from local authorities. Nor did he secure reliable renters for the

properties. When he could get renters at all, they were frequently high-risk renters who were not creditworthy. And in many cases, the properties were simply uninhabitable.

3. Due to the issues outlined above, the investment program was unsustainable. Battie could maintain it only as long as he had a steady stream of new investors—whose funds he used to make Ponzi payments to earlier investors. When the new funds dried up in March 2014, the scheme collapsed. The scheme caused losses of approximately $9 million from at least 70 investors.

4. As a result of his actions, Battie violated various provisions of the federal securities laws—including the antifraud provisions. In the interest of protecting the public from any further violations of the federal securities laws by Battie, the SEC brings this action. The SEC seeks permanent injunctive relief, disgorgement with pre-judgment interest, civil money penalties, and all other equitable and ancillary relief deemed necessary by the Court.

**JURISDICTION AND VENUE**

5. The SEC brings this action under Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)], seeking to permanently restrain and enjoin Battie from engaging in the unlawful acts, practices, and courses of business alleged herein.

6. This Court has jurisdiction over this action under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

7. The Defendant, directly and indirectly, made use of the mails or of the means or instrumentalities of interstate commerce in connection with the transactions, acts, practices, or courses of business described in this Complaint.

8. Venue is proper because the transactions, acts, practices, and courses of business described below occurred within the jurisdiction of the Northern District of Texas.

## PARTIES

9. Plaintiff SEC is an agency of the United States of America charged with enforcing the federal securities laws.

10. Defendant Battie, age 59, is a British citizen who resided in Decatur, Georgia until his arrest on January 23, 2015. He previously resided in Dallas, TX from 2008 to 2014. He is now incarcerated in state prison in California City, California. Battie has used the aliases "Carl Hampton" and "David Shephard." He has never been registered with the SEC or held any professional licenses. On January 5, 2016, he pleaded guilty to securities fraud, conspiracy, and elder abuse in *The People of the State of California v. Carl Keith Battie, et al*; CT No. CD255741; Superior Court of California, County of San Diego, Central Division. On April 26, 2016 he pleaded guilty to conspiracy to commit wire fraud in *United States v. Carl Keith Battie*; Case No. 3:16-CR-00051-D; N.D. Tex., Dallas Division. On October 24, 2016, a judgment was entered against him in that case, ordering him to pay $11,402,794.47 in restitution and to serve 120 months in federal prison. Finally, on December 22, 2016, a judgment was entered against Battie in the California case, ordering him to pay $3,870,597.92 in restitution and to serve 14 years in prison.

## FACTS

*A.  Battie claimed to acquire residential properties for the benefit of his investors.*

11. Beginning as early as 2006, Battie began acquiring dilapidated residential properties. The properties were primarily single family residences located in St. Louis, Missouri, and built approximately 100 years ago. Most of the properties were bought out of foreclosure

after being repossessed by the mortgage holder(s).  The properties were concentrated in low-income, high-crime areas.  Battie's stated intention was to refurbish them to rent or sell at a profit.  Early on, Battie hired subcontractors who performed some rehab work on them.

12.  Battie's renovations became less and less diligent over time.  In many instances, he enhanced a property's exterior just enough to make it appear refurbished, and renovated a property's interior just enough to obtain an occupancy permit.  However, in other instances, he never completed or even started the rehab.

13.  Battie conducted his operations out of the Dallas area.  He did this through several business entities—all of which were based out of the Dallas area.

*B.  Battie offered two different types of investments in the fraud scheme.*

14.  In 2008, Battie began offering investments in the properties.  He offered two different types of investments.  The first was presented as a turn-key investment in the properties themselves.  The second was presented as a mortgage note secured by the properties.

15.  In the turn-key program, investors were told that: (1) properties would be acquired and rehabbed; (2) credit worthy tenants would be found, screened, and placed; (3) rent would be collected; and (4) the properties would be managed through the term of the investment.  Investors were supposed to be able to cash out after 3-4 years, when the properties would be sold.  The investment was marketed as being "Truly Passive & Guaranteed"—with all aspects handled by the property management team.

16.  In the "mortgage note solution" program, investors were sold mortgage notes that were secured by deeds of trust on the properties.  So instead of buying the properties themselves, the investors were told that they could buy a note—secured by the real property—at a discount.  This discount supposedly provided an "instant profit" on the investment.  Like the turn-key

investment, this investment was marketed as fully guaranteed—"regardless of any default" by tenants or mortgagees. The investments were also completely passive for the investors. Battie's companies were responsible for all aspects of administering the notes—including collecting and accounting for monthly payments, tax and insurance remittance to appropriate government agencies and insurance companies, and property maintenance.

C.     *Battie fraudulently marketed the investments through a Dallas-based investment firm.*

17.    Because he wanted to remain anonymous to investors, Battie used James Christopher Dannenfeldt ("Dannenfeldt") and his Dallas-based firm as a front to market the investments. Dannenfeldt met Battie in January 2011 while travelling to St. Louis with several other individuals to look at some of Battie's properties. Shortly thereafter, the two entered into a business relationship.

18.    The relationship called for Battie to control the acquisition and rehab of the properties. Dannenfeldt was to market the investments to prospective investors through financial planning seminars conducted in the Dallas area. Battie directed Dannenfeldt on how to pitch the investments to prospective investors.

19.    During the seminars, Dannenfeldt gave slide presentations that warned investors of an impending economic downturn and touted Battie's investments as a way to avoid it. Dannenfeldt represented to investors that he and his "team" owned or controlled thousands of properties that they could easily locate, purchase, rehab, and provide tenants for the offered real estate investments. He further represented that the tenants would be stable civil-servant-type individuals, and that all rental payments were guaranteed. Investors were told that they could "earn double digit returns that ranged from 16% to 35% per year."

20. Most of the information contained in the slide presentations and handed out to investors came from materials provided by Battie. Battie also participated in revising and approving the investor presentations.

21. As Battie knew, the investor presentations were littered with misrepresentations. There was no "team" managing the acquisition and management of the properties—only Battie and a couple of administrative assistants. Nor were the properties occupied by stable, civil-servant-type renters. If they were occupied at all, the renters were frequently high-risk and not credit worthy. Nor were the rental payments guaranteed. Nor did Battie own and control thousands of properties—but rather less than 150 properties.

22. In addition, there was no basis for claiming that investors could expect 16-35% annual returns. In reality, the properties were in poor financial and physical shape. They were significantly overvalued, badly maintained, and the few tenants that did occupy properties were not able to make rental payments sufficient to cover the mortgages.

D. *Battie's orchestrated fraudulent land flips as part of his scheme.*

23. Using a series of shell companies that he controlled, Battie orchestrated and carried out a fraudulent land flip scheme. He did this to create the illusion that his properties were more valuable than they really were—and to thereby cover up the financial problems with the investments.

24. The fraudulent transfers followed the same general blueprint. Battie, using the various shell companies, flipped the properties one or more times over the course of several months or years. This created the appearance of a market and inflated the appraised values of the properties.

25. At Battie's direction, associates falsified signatures and notarizations on property records that were later filed with the St. Louis County Clerk's office and the City of St. Louis Recorder of Deeds.   None of the transactions were closed at a title company and no title policies were ever issued for any of the properties.

26. The result of Battie's transactions was an inventory of fraudulently overvalued properties that he could sell to unsophisticated investors.  At Battie's direction, Dannenfeldt marketed the fraudulently inflated properties to victim investors.  He then paid one of Battie's companies from investor funds.

*E.   Battie's Ponzi scheme collapses.*

27. Despite the problems outlined above, the investments appeared to be doing well into early 2014.  Battie and Dannenfeldt had raised at least $8,851,923.89.  And for the most part, investors were receiving their rent and note payments in a timely manner.

28. However, these returns where completely illusory.  In reality, Battie was having trouble finding paying tenants for the properties.  Investors were only being paid because Battie and Dannenfeldt were able to continue to raise more money through new sales to investors.  This allowed Battie to make Ponzi payments to earlier investors using funds from later investors.

29. Then, on March 4, 2014, Dannenfeldt died suddenly.  This caused the scheme to collapse.  Without new money coming in from Dannenfeldt, Battie was no longer able to continue paying the fraudulent "returns."  Ultimately, this caused the scheme to collapse.

30. Battie tried to prevent the collapse of the scheme.  Dannenfeldt's death raised concerns among investors regarding how their investments would be managed.  Battie knew this, and within a week began contacting investors.  He did not use his real name—but rather the alias Carl Hampton.  Battie claimed that he was taking over the management of the investments.

31.     Despite Battie's efforts, the scheme collapsed.  In the weeks and months that followed, investors learned the truth.  They found out that the properties were significantly overvalued, in poor physical condition, and that the few tenants who did exist were not able to make rental payments sufficient to support the mortgage payments.  It also became apparent that there was no "team" managing the investment properties—but rather Battie himself.

## CLAIMS FOR RELIEF

### First Claim
### Violations of Section 17(a) of the Securities Act

32.     The SEC re-alleges and incorporates paragraphs 1-31 by reference as if set forth fully herein.

33.     Defendant Battie, directly or indirectly, singly or in concert with others, in the offer or sale of securities, by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails:  (a) employed devices, schemes, or artifices to defraud; or (b) obtained money or property by means of untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon the purchasers.

34.     With respect to violations of Sections 17(a)(2) and (3) of the Securities Act, Battie acted knowingly, recklessly, unreasonably, or negligently.  With respect to violations of Section 17(a)(1) of the Securities Act, Battie acted knowingly or recklessly.

27. Consequently, Battie has violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## Second Claim
## Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

28. The SEC re-alleges and incorporates paragraphs 1-31 by reference as if set forth fully herein.

29. Defendant Battie, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce or of the mails, knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operate or would operate as a fraud or deceit upon purchasers of securities, or upon other persons.

30. Consequently, Battie violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## Third Claim
## Violation of Sections 5(a) and 5(c) of the Securities Act

31. The SEC re-alleges and incorporates paragraphs 1-31 by reference as if set forth fully herein.

32. Defendant Battie directly or indirectly, singly or in concert, has made use of the means or instruments of transportation or communication in interstate commerce, or the mails, to offer and sell securities when no registration statements was filed or in effect as to such securities

and when no exemption from registration was applicable.

33. Consequently, Battie violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c).]

## RELIEF REQUESTED

The SEC respectfully requests that this Court enter a judgment:

A. Permanently enjoining Defendant Battie from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)]; and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

B. Ordering the Defendant to disgorge $8,851,923.89, an amount equal to the funds and benefits he obtained illegally, or to which he is otherwise not entitled, as a result of the violations alleged, plus prejudgment interest of $1,384,375.24, for a total of $10,236,299.13; but deems payment of these amounts satisfied by the criminal order to pay restitution of $11,402,794.47.[1]

C. Declining to impose civil penalties upon Defendant, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] because of his criminal convictions and prison sentences.

D. Ordering such other relief as this Court may deem just and proper.

---

[1] *See* Unopposed Motion to Enter Final Judgment which is being filed in conjunction with the Complaint.

Dated:   April 27, 2017					Respectfully Submitted,

						*/s/ Chris Davis*
						Chris Davis
						Texas Bar No. 24050483
						Burnett Plaza, Suite 1900
						801 Cherry Street, Unit 18
						Fort Worth, Texas 76102
						(817) 900-2638
						(817) 978-4927 (fax)
						davisca@sec.gov